The opinion of the Court was delivered by
Waejdlaw, Ch.
Upon some of the points in this case brought under our review by the appeal, we are content with the reasoning of the Chancellor in the circuit decree, but it is proposed to add some observations as to the execution of the deed, and as to the effect of J. G. Brown’s possession.
Where a deed is not liable to suspicion as to its date, if it purports to be thirty years old, it proves itself. The purpose of requiring proof as to a deed seemingly ancient, that it is produced from the proper custody, and that possession has been had under it, is to give assurance that it is truly ancient, and not antedated. In the present instance, the deed has been recorded in the registry of mesne conveyances for Barnwell more than thirty years, and the settlor and trustee who executed the indenture, (the signatures of whom are proved,) have been dead more than thirty years : so that the deed is necessarily of the *172 age requisite for intrinsic proof. Where a deed is admitted in evidence as an ancient deed, it must be admitted as formally executed by signing, sealing and delivery. It is unnecessary to dwell on this point, as sufficient secondary, evidence has been offered to prove the execution of the deed in question, if it be not self-proving.
It is proper to discuss more fully the effect of J. G. Brown’s possession of the slaves in controversy under a deed not recorded in the Secretary of State’s office. It has been earnestly urged upon us, that the decree in this case is in conflict with recent decisions of the Law Court in Ford vs. Aiken, 4 Rich. 121, and Burgess vs. Chandler, Ib. 170. If we supposed there was any such conflict, we should either conform to the judgment of the other Court, or send the case to the Court of Errors. The administration of justice between two Courts, professing to proceed on the same principles in matters of concurrent jurisdiction, would be justly unsatisfactory, if a party in the same state of facts should succeed or fail accordingly as by choice or compulsion he might be before one or the other of the tribunals. The great object of establishing a Court of Errors was to redress this mischief of conflicting decisions in the two Courts. But there is no conflict in the present instance. The judgments in the cases cited, are not inconsistent with the decree under review. Ford vs. Aiken and Burgess vs. Chandler decide, that where a father-in-law delivers slaves to a son-in-law, the law raises the presumption of gift; and that if the father-in-law, by some secret arrangement, give the delivery the form of hiring or loan, and reserve the absolute title to himself, he is guilty of constructive fraud or of concealment, having all the consequences of intended deceit, as to subsequent creditors of the son-in-law, who extended credit on the faith of his ownership of the slaves. This is not new doctrine. It has been asserted by this Court, in Garrett vs. Bank of Hamburg, 1 Strob. Eq. 66 ; White vs. Palmer, McMul. Eq. 115 ; Edings vs. Whaley, 1 Rich. Eq. 301. The presumption of gift in such case, arises irom the relation of the parties, and the duty of the *173 father to provide for the maintenance and settlement in life of his children; and, as between the parties themselves, it cannot be rebutted by any subsequent modification of the gift against the will of the son-in-law; nor as to his subsequent creditors by cotemporaneous modification of which they have no notice, actual or constructive. ■ But thé presumption of gift from mere custody of slaves, does not arise in the case of strangers in blood, not even in the case of step-father and son-in-law. Willis vs. Snelling, 6 Rich. 283. Nor where the possession is derived from a stranger, is there any allocation for constructive fraud upon the creditors of him in possession. In such case, it is a question of intentional fraud. If one having the legal title, deliver-possession to a stranger, with the purpose of enabling him to commit a fraud on purchasers or creditors ; or if he wilfully allow the possessor to claim the property, and treat it as his own; he is guilty of express fraud, and cannot re-claim the property against one wrongfully deceived. Brooks vs. Penn, 2 Strob. Eq. 120. Where a father delivers possession of a chattel to a married daughter, and by secret reservation of title to himself, endeavors to obstruct the jus mariti, he obviously violates the policy of the State, in prescribing registration of marriage settlements ; and properly fails in a contest with creditors of the son-in-law who have trusted to his apparent ownership. But in a case where the duty of maintenance does not exist, where the Legislature has not prescribed notice to creditors by registration or otherwise, and where no deceit is intended, it would be preposterous to hold that the owner could not maintain his title against the creditors of him in custody of - a chattel, although they may have had no notice of the title in another. If A. should hire a slave to B., a stranger, for a week, or for years, without any intentional fraud, it would not be pretended that B.’s possession of the slave gave his creditors any right to purchase the chattel for the satisfaction of their debts, although they may have had no notice of the bailment, and may have rashly inferred from his mere possession, that B. was owner. It is conceded in the argument here, that the notion *174 of constructive fraud from the mere transfer of possession so as to defeat title, has no application except as to dealings between father and son, or son-in-law. But it is argued that Bartlett Brown, the donor in the deed, by omitting to record the deed in the office of Secretary of State, enabled his son Jabez, who af-terwards came into possession of the slaves, to commit a fraud upon his creditors, and incurred the consequences- of constructive fraud.
The argument lacks the necessary grounds of fact, that the donor transferred the possession of the slaves to the son while title abided secretly in himself, and that the law requires such a deed to be recorded in the Secretary of State’s office.
Bartlett Brown retained possession of the slaves during his life time, and as long as any title continued in him or his representatives by operation of the deed. He obtained, and he sought, no advantage from his own wrong. He transferred no possession to his son, which the security of creditors required him to keep, on pain of forfeiting all title and advantage to himself. He did not knowingly permit his son to acquire any delusive credit by possession of the property.
If there was any obligation by law to record the deed, the duty was imposed upon the trusteee, and not the donor. If the law does not require recording of such deeds in the Secretary of State’s office, registry there would not operate as constructive notice to creditors ; and so far as good faith is involved in measures for giving notoriety to the deed, and thus preventing the life tenant from deluding creditors by his possession of the property, recording the deed in the Clerk’s office in Barnwell, was better adapted to the end, than recording it elsewhere. That was the proper office for recording as to the lands conveyed by the deed, and in that District all the parties resided. Incautious creditors frequently suffer by the constructive notice to them, arising from the legal registry of instruments of title ; and they suffer, in the same lack of actual information, where notice of title separate from possession of the chattel, is not required to be given to them. No contrivance of man can make the state *175 of the title, where it is not co-incident with possession, so noto rious as the fact of possession. It is clear, and it is conceded in the argument of appellant’s counsel, that no statute of the State requires a gift of slaves by deed of trust to be registered in any office ; but it is insisted, that as the law requires certain conveyances of personalty, for certain ends, to be recorded in the Secretary’s office, this permits the recording there, of all conveyances of personalty, and makes the omission of the donor to avail himself of the permission in the special case of a father giving to a child or son-in-law, a constructive fraud upon the creditors of the donee in possession. Before the Act of 1843, concerning mortgages, which does not apply to this case, the only Act of this State, now in force, relating to registry of transfers of personalty other than marriage settlements, was the Act of 1698, (2 Stat. 137,) which includes only sales and mortgages of negroes and other chattels. This trust deed is neither sale nor mortgage. As to sales and mortgages, the Act does not absolutely require recording. It merely postpones a sale or mortgage not recorded in the Secretary’s office to a subsequent sale or mortgage which has been so recorded. An unrecorded conveyance of personalty, not infected with fraud, is good against any posterior title except a sale or mortgage made by the same grantor, and properly recorded. According to the construction given in Youngblood vs. Keadle, 1 Strob. 122, the Act was intended to guard, against double sales or mortgages by the same person ; and it was held there, that a bill of sale made by one to whom A. had transferred a slave by parol sale and delivery, had no precedence under the Act to A.’s prior unrecorded mortgage ; and the bill of sale was treated as the Act of a third person. Here the bills of sale under which defendants claim were made by Jabez G. Brown, through his agent, the sheriff, and in no proper sense can be treated as the acts of the grantor in the trust deed. See Bush vs. Bush, 3 Strob. Eq. 131. The will of Bartlett Brown was revoked by the deed as to the estate conveyed by the latter; and in no view is a will to be regarded as a sale or mortgage within the meaning of the Act of 1698.
*176 The plaintiffs themselves have been guilty of no fraud concerning the deed or the property conveyed by it, unless it may be in not making proclamation of their interest in the slaves on the occasion of the sheriff’s sale. But they were not present at the sale; they did not procure their father’s possession of the slaves; they are not bound by his misrepresentations made while they were absent; they probably supposed that the life estate of their father was liable to sale; and their equitable right, contingent on their surviving their father, was not then vested in title or possession. Under these circumstances, they are not affected by the fact that purchasers were not apprised of their claim under the deed.
If any person committed a fraud,, it was the life-tenant, and it would be a strange result, that his deceit, without collusion with the remaindermen, should defeat their estate, and enlarge his own into a fee, even for the benefit of his creditors. He would make profit from his own wrong. And however we may be disposed to protect creditors, we should not encourage, for their benefit, speculating frauds by tenants of particular estates against those entitled to the fee.
It is ordered and decreed, that, the appeal be dismissed, and the circuit decree be affirmed.
DunkiN and Dargan, CC., concurred.
J ohnston, Ch., absent at the argument.

Appeal dismissed.

NOTE. — -The following circuit decree of Ch. Johnston, valuable for collecting all the Acts concerning registry, and his comments on them, is here appended as a note to Brown vs. Wood:
REBECCA DOPSON, Admx. JANE HARLÉY and JOHN A. HAYS, f BarnweI1 District. Adm’ors of JAS. HARLEY, et. al J
The above cause came to trial before Chancellor Johnston, on the IstEebruary, 1852. The bill stated that in 1798, one Edward Harden made a voluntary conveyance of certain slaves to his near relation, Joseph R. Dopson, in trust for the joint use of the plaintiff Rebecca, wife of said Joseph R. Dopson and the other plaintiffs, her children, undone Robert Miller, a nephew; that Joseph R. Dopson, during his life, disregarding his *177 character as trustee, sold some of the slaves contained in the said deed, and that all the purchasers had notice of the deed of 1798; the bill then prays for a delivery of the negroes, and for an account of their hire.
The defendants pleaded that thoy were innocent purchasers, for valuable consideration, without notice, &c.
The said deed was dated the 24th November, 1798, and was recorded in the office of Begister of Mesne Conveyances for Beaufort District, on the 1st November, 1799, and nowhere else.
“I shall now enquire,” says the Chancellor, “whether the defendants and those under whom they claim had notice of the deed, premising that wherever in tracing a title in defendants, you first come upon an innocent purchaser having no notice, from that moment the title is considered sacred in Equity 5 under which principle, a purchaser with notice, from one without notice, is protected in this Court. The plaintiffs insist that the defendants and those under whom they claim, are fixed with notice — 1. By rumor — 2. By certain public proceedings — 3 By recording the deed; and 4. By actual personal notice. X know of but two kinds of notice: actual or personal, and constructive or implied. Under one or the other of these heads, the different modes in which it is contended the defendants were notified of the deed must fall.”
The Chancellor then goes on to argue that constructive notice cannot be implied from rumor, however general. Passing from that, he decides that no notice is to be inferred from the public proceedings relied on, consisting of a decree relating to the property, pronounced after the purchases; and then he takes up the question of recording, (a)
“To operate as constructive notice,” he proceeds, “the recording must have been in the office pointed out by law, and the deed must be of that from which it is calculated to impart the notice intended by law. The deed in question was recorded by the Begister of Mesne Conveyances for Beaufort, the 1st November, 1799. That was the only recording, either of the deed itself, or of any abstract or memorial of it, that ever took place within this State or elsewhere. In my opinion, the deed was not properly recorded.
“ An Act was passed on the 16th June, 1694, entitled 'An Act for the better and more certain keeping and preserving of all registries and public writings of this part of this province.' I have not the means of ascertaining its contents, or knowing whether there exist any other traces of the Act than the title, which is to be found in the 7th page of the titles of the Acts of Assembly preceding the Public Laws, and is numbered 106.
“ By the Act of 1698, (b) it is declared that that conveyance of lands and tenements, which should be first recorded in the Begister’s office in Charleston, then the only office of that kind in the province, (and the same, I apprehend, which is in subsequent Acts styled ‘the Begister’s Office of the Province,’) should be preferred over all others: And that that conveyance of negroes, goods or chattels which should be first recorded in the Secretary's office in Charleston should be preferred over all others: under which Act, by the way, it has been adjudged (c) that the term ‘ Chattels ’ was not intended by the framers of the Act to include chattels real; conveyances of which must be recorded by the Begister.
“The Act goes on to subject these two officers to damages for false certificates to enquirers concerning the conveyances recorded in their offices respectively. This statute *178 clearly makes the Register's the proper office for recording conveyances of realty, and as clearly points out the Secretary's as the proper office for recording conveyances of personalty, expressly including negroes.
“ The next Act on the subject of recording is that of 1731 (d). It relates altogether to lands; but perhaps something may be gathered from it. The 18th clause declares that the office of Register, (styling it ‘the office of Register of this Province,’) established for recording mortgages and conveyances of landsi shall be continued distinct from all other recording or other offices, among which is mentioned that of Secretary of State* whose duties we have already seen in the Act of 1698. This legislation still leaves the Secretary’s the proper office for recording conveyances of negroes; unless, indeed, by a strained construction, one particular kind of conveyance of them (mortgages) might be recorded with the Register. No admissible construction would include ssuch conveyances as Harden’s deed of 1798.
“ The 22 Article of the Constitution, adopted 26th March 1776, (e) provides that the Register of the Province be chosen by joint ballot of the General Assembly and Legislative Council, but does not alter his duties.
“ The 29 Article of the Constitution of 1778, (f) próvidos for the election by joint ballot of the Senate and House of Representatives, of a Register of Mesne Conveyances for each district (District Courts had in the mean time, particularly in the Act of 1769 (g) been established): but the Article of the Constitution last mentioned leaves the duties of the Register the same as before. We shall see hereafter, that no Register was by law, in obedience to this Constitution, given to Beaufort until 1786.
“Then comes the County Court Act of 1785; (h) from the operation of which, by its 67th section, the district of Beaufort, (in its whole extent, as dofined by the 2 sect, of the Act of 1769,) (i) is exempted, together with the districts of Charleston and Georgetown.
“ The 45th section (k) enacts that within times, therein limited, conveyances for lands> tenements and hereditaments shall be recorded in the offiee of the Clerk of the County Court, within whose county the lands lie; at the same time declaring that such conveyances shall not be admitted to record, except upon proof of their execution in open Court, by the acknowledgment of the grantors, or by the oath of two witnesses. This section also declares the effect of recording conveyances of lands.
“ The 47th section (l) (the only one in which personalty is mentioned,) is as follows : « And to the end that persons who are inclined to lend money upon the security of lands or negroes, or to become purchasers thereof, may more easily discover whether the lands or slaves offered to be sold or mortgaged, be free from incumbrances: Be it further enacted, that a memorial of sales and conveyances, mortgages, marriage settlements, deeds of trusty whereby any lands or slaves residing in this State, charged, encumbered *179 or passed from one person to another, shall be registered in the Secretary's office, in books to be kopt for that purpose, which memorial shall contain the date of the deed of conveyance, the names, surnames and additions of the parties thereto, the consideration mentioned therein, the lands conveyed, settled or mortgaged, and where the same lies} and the number, names and ages of the slaves, if any be sold, settled or mortgaged: And the Clerks of all and every of the County Courts, within this State, are hereby required, twice in every year—in the month of January and June,—to transmit memorials of all such deeds, settlements, mortgages, or other conveyances, as shall have been proved and recorded in their respective Courts, the preceding half year, to the Secretary’s office, to be there registered as aforesaid.'
“ An Act of 1786, (m) declares that in obedience to the Constitution (of 1778,) a Register of Mesne Conveyances shall be appointed for Beaufort, to possess ‘ like powers and authorities with those exercised by the Register in Charleston,5 that is, (I apprehend,) the powers conferred by the Act of 1698. A Register is at the same time given to Georgetown.”
“Another Act of 1786, (n) relating to the subject of recording, only goes to amend the Act of 1785, by providing a different mode of proving deeds in certain cases, in order to their being recorded in the County Courts.
“ The Act of 1788, (o) further amends the Act of 1785, by entitling deeds to record in the County Courts, upon acknowledgment of their execution by the grantors before a Judge of the Superior Courts, or the oath of one witness before a justice, out of Court.
" The Act of 1785 is further amended by that of 1789, (p) which extends the time for recording conveyances for lands.
“ Stopping the investigation at this point of time, it appears to me, that in 1789, such a deed as that of Harden could not be recorded in the Register’s office for Beaufort.
“ The Act of 1698, gave the registration of such deeds to the Secretary of State. There is nothing in any succeeding ordinance to take them from him, except the 47th section of the County Court Act. Upon that section it may be observed, that it does not positively require that such deeds should be recorded in the County Courts. The law would have been fully satisfied, for any thing contained in that section, if such deeds had been recorded in the Secretary’s office, although never recorded in the County Court. In other words, if the Act of 1698 had been observed, nothing more could be required by virtue of the section referred to. But if the whole deed was not recorded in the Secretary’s office, agreeably to the Act of 1698, then it was required by that section, that at least a memorial should be registered in that office j in which case the enquirer must be sent to find the deed set out at length in the County Court, to which the memorial would refer him.
“ The Clerk of the County Court could not refuse to record a deed for lands, because the 45 section of the Act under examination declared that deeds for lands should be recorded in his office. He might have refused to record deeds for negroes, because the 47 section, (the only one which relates to conveyances of personalty,) does not declare that such deeds shall be recorded in his office. In that case, the grantor would have been driven to register his deed at large in the Secretary’s office. If, however, the Clerk undertook and did record, in which case, he became quasi the agent of the grantee, then a memorial *180 was positively required to bo recorded in the office of Secretary. In either case, the Secretary’s office was made by law the point whence notice was to issue to subsequent creditors and purchasers. It was essential that some such central point of warning should be established, as related to persanalty; which being transitory in its nature, (and the evidence of right as to which, lying mostly in possession,) it might be carried from district to district, and from county to county, and purchasers under such circumstances would not otherwise have been safe without consulting the records of every County Court in the State.
“ That the Secretary’s office was intended as a central point for extending notice, and that the County Courts were not intended, but through this centralpoint, to communicate notice, may be inferred from another circumstance. The 47th section of the Act of 1785 does not declare the effect of recording the deed in the County Court, or the memorial in the office of the Secretary, and the effect cannot be learned unless we call in tho aid of the Act of 1698. Butting the 47th sect, of the Actof 1785, and the Act of 1698 together, I infer that the Legislature, by both, meant, that all deeds of personalty should, in some shape or other, be recorded by the Secretary; and when recording took place there, in that case, and in that case only, shouldthe recording have an effect to work a preference among deeds for the same property. A recording in the County Court alone, worked no preference.”
The Chancellor proceeds to argue, that even admitting that the County Court Clerks wero bound to record deeds such as the one under consideration, (q) and that such recording operated constructive notice, still that would not authorize recording them by the Register of Mesne Conveyances in Beaufort District, (where no County Court was ever established,) or raise an implication of notice from such reading. He maintains that the offices of County Court Clerk and the District Register of Mesne Conveyances were distinct; that their duties were different as respects this subject of recording; that the duties of the Register were defined by the Act of 1698; those of the Clerk, by the Act of 1785, and that the duties of the Clerks of County Courts were limited by tho extent of the County Court system; thatthe only case in which the Secretary’s office was not the only proper office for recording conveyances for negroes, was where County Courts existed; and that in no case, had a District Register the right to record such conveyances.
It may not be out of place hereto state that County Courts were abolished in 1799, (see 7 Stat. 291.)
“That District Registers of Mesne Conveyances” proceeds the Chancellor, “had no such right,” (the right to record such conveyances,) “ appears, I think, by a legislative exposition of the recording law. It will be recollected that the throe districts excepted out of the County Court system were Charleston, Beaufort and (Georgetown. Of these, Charleston always possessed a Register. In 1786, Registers were given to Beaufort and (Georgetown also, possessed of the same powers as those exercised by the Register of Charleston. What powers, in relation to recording were thus conferred on the Registers of Beaufort and Georgetown 2 Did they extend to the recording conveyances of negroes or any other species of personalty 7 If they did, why was it deemed necessary to confer that right on the Register of Georgetown, as the Legislature did by the Actof 17917 (r).
“ Up to the passage of that Act, no Register of Mesne Conveyances in the State, and after it, none but the Register of Georgetown could rightfully record conveyances of negroes.
*181 " In 1799 the Clerks of the District Courts for every district except Georgetown and Charleston, were by statute (s) constituted, in virtue of their clerkships, Registers of Mesne Conveyances for their respective districts; but their duties were left, as by the Act of 1698, to extend only to the recording of conveyances for land. And thus, I believe, matters remain to this day; the Legislature still electing, under the Constitution of 1778, the Register of Georgetown and Charleston; while those of other districts, being Clerks of the District Courts, are elected by the people.
" My opinion, then, is, that since the abolition of the County Courts, (which took place on the 1st January, 1800,) (t) the only proper office for registering conveyances of personalty is that of the Secretary of State, excepting only conveyances of that description in' Georgetown, which by special statute may be recorded by the Register of that district.
" Granting, however, that the Register of Beaufort was the proper recording officer, in the first instance, for Harden’s deed, there would be several difficulties in implying notice from the registration there.
“ The first difficulty is, that no memorial of the deed was recorded with the Secretary of State ;
" The second is, that the deed was not proved before it was admitted to record;
** The third is, that the deed recorded is not of a form calculated to give tho notice intended to be produced by recording.
“ Upon the first, my opinion is, that the registration of a memorial with the Secretary is indispensable ; and that creditors or purchasers will not be disturbed in this Court unless notice has been extended to them by the means afforded for extending constructive notice. Registers act for the benefit of the claimants under the deeds recorded by them, and not for the benefit of but against subsequent creditors and purchasers. ll follows, then, that as between an equitable claimant and subsequent creditors and purchasers, the Register, although a public officer, is to be considered the agent of the equitable claimant, — rather than that of subsequent creditors and purchasers, — for the transmission of the memorial to the Secretary; and on his failure to transmit it, the equitable claimant rather than the creditors or purchasers, should suffer in the first instance, and be thrown, for relief, on his remedy against the defaulting officer.”
The Chancellor then considers the second difficulty, (that the deed was not proved before it was admitted to record,) and then passes on the third objection, to wit: that the deed is not of a form calculated to give the notice intended to be produced by recording.
In regard to this objection, he says, “I think it is substantial. The Act of 1785 requires that the memorial, and of course, the deed, should set forth the names and ages of the slaves. Some description of the slaves, to make them known when carried from place to place for sale, was absolutely necessary, in order to put purchasers on their guard. The age and name of a slave would, in general, answer this salutary purposo. The deed from Harden does not state ages of any of the slaves. The Act, if insisted on, by the plaintiffs, must be shewn by them to have been strictly complied with — constructive notice cannot otherwise be implied.
" Before I quit this subject of recording, I may be allowed,” says the Chancellor, “ to say, that I have not found any decision in which recording conveyances of personalty by the Register has been held good. I do not know how to interpret some expressions used *182 in Harrison vs. Strother, (u). In that case, the deed recorded by the Secretary was preferred. Still, it must be admitted, the language of the report is very vague. The deed recorded by the Secretary was certainly * first recorded,5 and being recorded by the Secretary, was rocorded 'somewhere in the State.’
“ The result of this investigation is, that constructive notice cannot arise from the recording of the deed of 1798. The only remaining inquiry upon the subject of notice, is, Was there actual personal notice 7 ”
The Chancellor then proceeds to conduct this inquiry at considerable length, and finally decides that some of the defendants had actual notice, and that others had not. In regard to the former class, he gives relief, and in regard to the latter, he dismisses the bill, and so sustains the plea of purchase for valuable consideration.

 Rutland vs. Smithy 1 McC. Ch. 405; Irby vs. Venning, 2 McC. 379-380. Bank vs. Hunmphrys, 1 McC. 388-90.

 Pub. Laws, 3; 1 Brev. Dig. 165-6.

 Ex Parte Leland, 1 N. & McC. 460.

 Trott’s Law; P. L. 131. 131. See note to Peay vs. Pickett, 3 McC. 323.

 Published with the Acts of 1823, p. 154. This is tho oldest revolutionary constitution in the Union. It contains a very full enumeration of the causes of the revolution, coinciding with those set out in the declaration of independence adopted by the General Congress several months afterwards.

 Idem 160.

 P. L. 268; 1 Brev. 218; and see note to 1 Brev. 215.

 P. L. 385.

 P. L. 269; 1 Brev. 219.

 P.L. 381 ;1 Brev. 171.

 P. L. 382; 1 Brev. 172.

 P. L. 400, No. 1418.

 P. L. 401, No. 1419.

 P. L. 453; IBrev. 173.

 P. L. 485; IBrev. 173-4.

 Compare 1 Faust 17 with do. 19 20. Et Vide P. L. 475—No. 1570.

 1 Faust, 89; 1 Brev. 176.

 2 Raust, 318; 1 Brev. 119.

 2 Raust, 265.

 1 Bay. R. 332.